UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANNA ALMERICO, CHELSEA GAONALINCOLN, MICAELA AKASHA DE LOYOLA-CARKIN and HANNAY SHARP,<br><br>    Plaintiffs,<br><br>    v.<br><br>LAWERENCE DENNEY, as Idaho Secretary of State in his official capacity, LAWRENCE WASDEN, as Idaho Attorney General in his official capacity, RUSSELL BARRON, as Director of the Idaho Department of Health and Welfare in his official capacity and THE STATE OF IDAHO,<br><br>    Defendants. | Case No. 1:18-cv-00239-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

Idaho Code § 39-4510 provides that all healthcare directives executed by women in Idaho must contain the following provision: "[i]f I have been diagnosed as pregnant, this Directive shall have no force during the course of my pregnancy." The Court must resolve two interrelated questions in deciding Defendants' Motion to Dismiss. Dkt. 17. First, does the test for facial constitutional challenges outlined by the Supreme Court's decision in *United States v. Salerno*, 481 U.S. 739 (1987) apply to the case at bar? Second, if *Salerno* applies, is there a set of circumstances in which IC § 39-4510 can be

applied in a manner that comports with the Due Process and Equal Protection Clauses of the United States Constitution? Because the Court concludes that the answer to both questions is yes, it will grant Defendants' Motion to Dismiss, but with leave to amend to assert an as-applied challenge. In granting leave to amend, the Court does not encourage or discourage such a filing, and does not offer an opinion as to whether such a challenge can be successfully stated by an existing plaintiff.

## BACKGROUND

Idaho's Medical Consent and Natural Death Act, Idaho Code §§ 39-4501 *et seq.*, "recognize[s] the right of a competent person to have his or her wishes for medical treatment and for the withdrawal of artificial life-sustaining procedures carried out even though that person is no longer able to communicate with the health care provider." I.C. § 39-4509(2). The Act accomplishes this goal, in part, by providing a model "Living Will and Durable Power of Attorney for Health Care" forms (combined, the "Model Form"), that Idaho citizens may fill out. I.C. § 39-4510.

The Model Form is available for download on the Idaho Secretary of State's health care directory registry webpage.[1] Although Idaho citizens are not required to use the Model Form, in order for an Idaho citizen to register their Living Will and Durable

---

[1] Idaho Secretary of State, Health Care Directive Registry, https://sos.idaho.gov/hcdr/index.html (last visited March 27, 2019). Additionally, Plaintiffs' Complaint alleges that the Model Form was also available on the websites of the State of Idaho Office of the Attorney General and the Idaho Department of Health and Welfare. *Complaint*, Dtk. 1 at ¶¶ 29, 30. Although the web-addresses provided in the Complaint no longer contain the Model Form, at the motion to dismiss phase the Court will assume the truth of Plaintiffs' allegations with respect to the availability of the Model Form.

Power of Attorney for Health Care with the Idaho Secretary of State, the document submitted must be "substantially … [similar to, or] contain[] the elements set forth" (hereinafter, the "Incorporation Clause") in the Model Form. I.C. § 39-4510(1). A health care directive that fails to meet this requirement will not be registered by the Idaho Secretary of State. I.C. § 39-4510(2). But, the statute also provides that "[f]ailure to register the health care directive shall not affect the validity of the health care directive." I.C. § 39-4510(2). Obviously, this provision of the Act raises some question about whether a non-compliant, unregistered health care directive would be enforceable. However, for purposes of the pending motion, the Court will assume that it would not.[2]

This litigation stems from a single provision in the Model Form stating that "[i]f I have been diagnosed as pregnant, this Directive[3] shall have no force during the course of

---

[2] During the hearing in this matter on January 16, 2019, the Court engaged in an extended discussion with Counsel for both Parties over how the statute operates. In particular, the Parties acknowledged that there is ambiguity in the statute with respect to whether a woman with a healthcare directive that does not contain the Pregnancy Exclusion could, nevertheless, have her directive followed and her life terminated if she was both pregnant and incapacitated. Counsel for Defendants conceded that at this phase of the litigation, the Court should evaluate the constitutionality of the statute with the background assumption that a pregnant woman with a healthcare directive that does not contain the Pregnancy Exclusion would not have her care terminated in accordance with the express wishes of her healthcare directive. This interpretation of the statute accords with the interpretation of the statute put forth by the Idaho Secretary of State, the State of Idaho Office of the Attorney General, and the Idaho Department of Health and Welfare. The Court will proceed on the basis of this assumption but notes that the assumed interpretation is in no way binding on these or future litigants. That issue remains for another day.

[3] "Directive" is defined by the statute as "a document that substantially meets the requirements of section 39-4510(1), Idaho Code, or is a 'Physician Orders for Scope of Treatment' (POST) form or is another document which represents a competent person's authentic expression of such person's wishes concerning his or her health care." I.C. § 39-4502(8).

(Continued)

my pregnancy" (hereinafter, the "Pregnancy Exclusion"). I.C. § 39-4510. As discussed above, due to the Incorporation Clause, this provision is a necessary component of all health care directives in Idaho. The Idaho Secretary of State, in apparent reliance on the Pregnancy Exclusion, has issued the following guidance regarding health care directives on its "Frequently Asked Questions" webpage:

> [Question] 13. What happens if I am pregnant when I become incapacitated?
>
> [Answer:] Life sustaining measures will continue regardless of any directive to the contrary until the pregnancy is complete.[4]

Finally, if an individual (1) does not have an executed version of the Model Form or a document that satisfies the Incorporation Clause and (2) cannot consent to care due to age or health, then the Idaho Code provides that a "surrogate decision maker" may make health care decisions for the individual. I.C. § 39-4504(1). The "surrogate decision maker['s]" authority to consent to treatment on behalf of an individual is limited by statute in the following ways: "the surrogate decision maker shall not have authority to consent to or refuse health care contrary to such person's advance directives, POST or

---

[4] Idaho Secretary of State, Health Care Directive Registry – Frequently Asked Questions, https://sos.idaho.gov/hcdr/faq.html (last visited March 27, 2019). Additionally, Plaintiffs' Complaint alleges that similar language was also available on the websites of the State of Idaho Office of the Attorney General and the Idaho Department of Health and Welfare. *Complaint*, Dtk. 1 at ¶¶ 29, 30. Although the web-addresses provide in the Complaint no longer contain similar language, at the motion to dismiss phase the Court will assume the truth of Plaintiffs' allegations with respect to the presence of similar language.

wishes expressed by such person while the person was capable of consenting to his or her own health care." *Id.*

ANALYSIS

1. *Salerno* **Applies to Plaintiffs' Challenge**

   A. **Salerno's *"No Set of Circumstances"* Test**

The pivotal question here is whether Plaintiffs' facial challenge to the statute is governed by the Supreme Court's decision in *Salerno*. In *Salerno*, the Supreme Court stated that facially challenging a statute is "the most difficult challenge to mount successfully." 481 U.S. at 745. To prevail on a facial challenge to the constitutionality of a statute, a litigant must satisfy the heavy burden of showing that "no set of circumstances exist[] under which the [a]ct would be valid." *Id.* It is not enough to show that an act "might operate unconstitutionally under some conceivable set of circumstances." *Id.* Facial challenges are "disfavored" because they (1) "raise the risk of premature interpretation of statutes on factually barebone records," (2) "run contrary to the principle of judicial restraint," and (3) "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008) (internal citations and quotations omitted).

   B. *Debate Regarding the Validity of* **Salerno**

*Salerno*'s "no set of circumstances" test is the subject of considerable controversy. As Plaintiffs are quick to point out, Dkt. 26 at 10-11, a faction of Justices on the Court has regularly called into question the wisdom of *Salerno*. *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (Stevens, J., with two Justices concurring) (criticizing *Salerno* and labelling its "no set of circumstances" test as *dicta*). However, another faction has consistently reaffirmed that *Salerno* is the appropriate test for nearly all facial challenges. *See Planned Parenthood of S. Arizona v. Lawall*, 180 F.3d 1022, 1026 (9th Cir.), *opinion amended on denial of reh'g*, 193 F.3d 1042 (9th Cir. 1999) (discussing the schism that exists among the Supreme Court justices).

### C. *The Development of Exceptions to* Salerno

Unsurprisingly, exceptions have developed to *Salerno*'s "no set of circumstances" test. First, *Salerno* does not apply to facial challenges to statutes under the First Amendment. *Id.* at 1026. Second, the Supreme Court in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) appeared to conclude that *Salerno*'s "no set of circumstances" test does not apply to "undue burden" challenges to statutes regulating abortion. *See Lawall*, 193 F.3d at 1027 (concluding that *Casey* "overruled *Salerno* in the context of facial challenges to abortion statutes"). Pursuant to the Supreme Court's decision in *Casey*, plaintiffs can mount a successful facial challenge to an abortion statute, but only if they can show that the statute imposes an undue burden on the right to an abortion "in a large fraction of cases." *Casey*, 505 U.S. at 895; *see also*

*S.D. Myers, Inc. v. City & Cty. of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001) (discussing *Casey*'s "large fraction" test).

### D. *Plaintiffs' Challenge Does Not Fall Within the* Casey *Exception to* Salerno

Plaintiffs first argue that *Casey*'s "large fraction" test, rather than *Salerno*'s "no set of circumstances" test, should apply to their challenge to the Pregnancy Exclusion. According to Plaintiffs, the Pregnancy Exclusion limits a woman's ability to terminate her own life, and, by extension, the life of her unborn child. Dkt. 26 at 10-11. Thus, in Plaintiffs' view, the Pregnancy Exclusion is an abortion statute subject to analysis under *Casey*. Dkt. 26 at 4.

There are a number of problems with Plaintiffs' suggestion that we treat the Pregnancy Exclusion as simply a statute regulating abortion. First, Plaintiffs acknowledged in their opposition to Defendants' Motion to Dismiss that "[t]he Pregnancy exclusion *does not concern abortion rights*, but the right to be free of forced intrusions by the state into one's bodily integrity." Dkt. 26 at 4 (emphasis added). Second, the language of the Act simply does not regulate abortion procedures. Third, Plaintiffs fail to point the Court towards any precedent applying *Casey*'s "large fraction" test to statutes containing provisions similar to the Pregnancy Exclusion.

### E. *Absent Instruction from the Supreme Court or the Ninth Circuit, the Court Will Not Create a New Exception to* Salerno

Plaintiffs appear to be urging the Court to create a new exception to *Salerno*'s "no set of circumstances" test. Plaintiffs cite *United States v. Sampson* as an example of a

federal district court departing from *Salerno* and applying *Casey*'s "large fraction" test to a statute not involving abortion regulations. 275 F. Supp. 2d 49, 58 (D. Mass 2003). In *Sampson*, the court evaluated an Eighth Amendment facial challenge to the Federal Death Penalty Act. *Id.* The court declined to apply *Salerno* and, in doing so, wrote that *Salerno*'s "no set of circumstances" test:

> would require that the statute be upheld unless it would be unconstitutional as applied to everyone. Thus, under the *Salerno* dicta the FDPA would be constitutional if 99 times out of 100 it resulted in the execution of an innocent individual because there would be one case in which a guilty person would be executed. However, a statute that resulted in the execution of actually innocent individuals in 99% of all cases undoubtedly would be deemed to impose cruel and unusual punishment.

*Id.* Respectfully, *Sampson*'s reasoning is questionable. First, *Salerno* does not require that 99 innocent citizens be executed if the government can show that one individual can be executed constitutionally. *Sampson* ignores the crucial fact that each of the 99 innocent citizens would be entitled to bring an as-applied challenge to the statute.[5] Second, though members of the Supreme Court continue to debate whether *Salerno*'s "no set of circumstances" test is *dicta* or part of the case's holding, the test has unquestionably been incorporated into the holdings of binding case law from the United States Court of Appeals for the First Circuit, *Comfort v. Lynn Sch. Comm.*, 418 F.3d 1, 12 (1st Cir. 2005) (*en banc*), *abrogated on other grounds by Parents Involved in Cmty. Sch.*

---

[5] The Court notes that Plaintiffs in this case are entitled to bring as-applied challenges to the Pregnancy Exclusion. As will be discussed below, the Court is willing to entertain a motion to amend the complaint to make this an as-applied challenge on behalf of an existing plaintiff.

*v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007), and, more importantly for this Court's purpose, binding case law from the Ninth Circuit, *see, e.g.*, *S.D. Myers, Inc.*, 253 F.3d at 467.

Ninth Circuit case law does not support the creation of a new exception to *Salerno* in this case. Time and again, plaintiffs have attempted to escape the effect of the *Salerno* standard, only to see their path foreclosed by the Ninth Circuit. For example, in *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 539 (9th Cir. 2004) (C.J., Thomas), plaintiffs argued that *Salerno* did not apply to their Due Process and Equal Protection challenges to several Arizona statutes that imposed licensing requirements on abortion providers because "abortion rights … [were] involved." Chief Judge Sidney Thomas, writing for the panel, stated unequivocally:

> That abortion rights are involved does not alter th[e] rule [that *Salerno* applies rather than *Casey*]. Indeed, it is difficult to even articulate what application of the *Casey* standard to claims other than the undue burden claims would entail. Therefore, we apply the *Salerno* standard to all of plaintiffs' claims except their undue burden claim.

*Id.* *Tucson Woman's Clinic* is just one in a series of Ninth Circuit cases that reach this result. *See*, *e.g.*, *S.D. Meyers*, 253 F.3d at 467 ("While we have held that *Casey* overruled *Salerno* in the context of facial challenges to abortion statutes …, we will not reject *Salerno* in other contexts until a majority of the Supreme Court *clearly directs us to do so*." (emphasis added) (internal citation omitted)); *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971-72 (9th Cir. 2003) (rejecting plaintiff's attempt to

apply *Casey* to their void-for-vagueness challenge). The clarity of this line of authority forecloses Plaintiffs' argument for an exception to *Salerno*.⁶

2. **Circumstances Exist Under Which the Pregnancy Exclusion Can Be Constitutionally Applied**

Given that *Salerno* applies, with no exception available to Plaintiffs, the final question is whether there is a set of circumstances in which the Pregnancy Exclusion can be applied in a constitutionally acceptable manner. The Court finds that such circumstances exist.

### a. *A Potential Set of Circumstances Exists Under Which the State of Idaho May Limit a Woman's Ability to Prospectively Dictate Her Healthcare Choices*

As an initial matter, the Court notes that state laws limiting a pregnant woman's ability to prospectively dictate her healthcare choices are not rare. As of the Spring of 2018, thirty-four states had laws "either mandat[ing] that a pregnant woman's advance directive be disregarded entirely due to her pregnancy or require[ing] a woman to take some further affirmative step beyond creating an advance directive in order for her wishes to be carried out." Nikolas Youngsmith, *The Muddled Milieu of Pregnancy*

---

⁶I reach this conclusion with serious reservations. Analytically, it is difficult to see why the undue burden exception created by *Casey* should not apply to the Pregnancy Exclusion. I find no meaningful difference between a restriction on a woman's right to dictate, in advance, the end-of-life medical care she will receive if pregnant and a woman's right to choose, contemporaneously, between having an abortion or giving birth. It necessarily follows that the Supreme Court's modified view of the requirements for a facial challenge to an abortion statute, should apply here. If I were writing on a clean slate, I would so hold. But, the case law of the Circuit is clear and unyielding. It is my duty to follow that precedent.
MEMORANDUM DECISION AND ORDER - 10

*Exceptions and Abortion Restrictions*, 49 COLUM. HUM. RTS. L. REV. 415, 424 (2018). Though this fact does not, of course, answer the question of whether such laws are constitutional, it is nevertheless true that a majority of state legislatures have seen fit to pass laws that are at least nominally similar to Idaho's Pregnancy Exclusion.

Even though at least thirty-four states have laws limiting a pregnant woman's ability to prospectively dictate their healthcare choices, Plaintiffs fail to point the Court to a single case in which a law similar to Idaho's Pregnancy Exclusion has been struck down pursuant to a facial challenge. Plaintiffs cite a series of cases in which courts have wrestled with the question of whether, in essence, it was appropriate for the state to dictate the healthcare choices of one person in order to save the life of another. *See, e.g.*, *In re A.C.*, 573 A. 2d 1235, 1244 (D.C. App. 1990) (reversing a trial court's order granting a petition from a doctor to perform a cesarean section on a terminally ill patient despite the patient's express decision to decline the cesarean section). But, those cases provide no support for the proposition that Idaho's Pregnancy Exclusion is unconstitutional in all circumstances. Indeed, the very case on which Plaintiffs principally rely, *In re A.C.*, is all but fatal to their case; "[w]e do not quite foreclose the possibility that a conflicting state interest may be so compelling that the patient's wishes must yield, but we anticipate that such cases will be extremely rare and truly exceptional." *Id.* at 1252.

        **b.** ***A Potential Set of Circumstances Exists Under Which the State of Idaho Is Constitutionally Entitled to Dictate the Medical Care that a Woman Receives***

Plaintiffs make the conclusory allegation that "even under the *Salerno* standard" there are no set of circumstances in which the State of Idaho may dictate the healthcare choices of a pregnant woman. Dkt. 26 at 4-5. Pursuant to the Due Process Clause, the Court must first identify the liberty interest at stake, and then "balance [the] liberty interest[] against the relevant state interest." *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 279 (1990) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)). Under the Equal Protection Clause, the Court is normally required to determine the appropriate level of scrutiny to apply to a given law. *Tucson Woman's Clinic*, 379 F.3d at 543. Depending on the level of scrutiny required, the Court then applies the appropriate test. *Id.*

Though Plaintiffs cite a number of cases in which federal and state courts have struck down statutes that place limitations on an individual's ability to make their own healthcare choices, their argument fails to acknowledge that the Supreme Court in *Casey*, *Cruzan*, and *Washington v. Glucksberg*, 521 U.S. 702 (1997) (to name a few cases) has consistently held that there are certain circumstances in which a state's interest is sufficiently compelling to allow that state to, in effect, direct the care that the patient receives. Those circumstances could be constitutionally applied here to restrict a woman's right to control her end-of-life medical care.

In *Casey*, the Supreme Court reaffirmed its decision in *Roe* that "'subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in

appropriate medical judgment, for the preservation of the life or health of the mother.'" *Casey*, 505 U.S. at 879 (quoting *Roe v. Wade*, 410 U.S. 113, 164-65 (1973)). In *Cruzan*, the Supreme Court concluded that Missouri could, absent clear and convincing evidence of a patient's wish to terminate care, bar a patient's close family members from issuing a directive terminating that patient's care. 497 U.S. at 286. Finally, in *Washington v. Glucksberg*, the Supreme Court concluded that the plaintiff's Due Process Rights were not violated by a Washington state statute barring physician-assisted suicide. 521 U.S. at 735. Each of these cases stands in sharp relief to Plaintiffs' claim that it is unconstitutional in all circumstances for a state to dictate what healthcare an individual will receive.

The closest case that the Court has found to the case at bar is *Pemberton v. Tallahassee Mem. Regional Med. Ctr., Inc.*, 66 F. Supp. 2d 1247 (N.D. Fl. 1999). In *Pemberton*, hospital staff determined that plaintiff faced a substantial risk of injury to both herself and the child if she gave birth vaginally. *Id.* at 1249. As a result, they sought plaintiff's consent to perform a caesarean section. *Id.* Plaintiff refused. *Id.*

Post refusal, the hospital obtained a court order requiring plaintiff to consent to a caesarean section. *Id.* at 1249-50. The baby was delivered without complication, but plaintiff nevertheless sued the hospital alleging a variety of substantive challenges under the Constitution. The court, balancing the right of the state to protect a child's life against the invasion of the mother's right to autonomy in making her health care decisions, held that "state's interest outweighed the mother's." *Id.* at 1252.

The same reasoning applies with equal force in this case. Simply put, there are circumstances under which a pregnant woman's right to autonomy in her health care decisions can be circumscribed by the state's right to protect a third party. Those situations may very well be rare, but they exist. Under *Salerno*, that is all Defendants must show.

**CONCLUSION**

Today's decision is limited in scope. Plaintiffs have only pursued a facial challenge to the Pregnancy Exclusion. This challenge is subject to *Salerno*'s "no set of circumstances" test, which Plaintiffs have failed to meet. But, the Court hastens to add that it has little difficulty imagining circumstances in which the Pregnancy Exclusion is unconstitutional.

Indeed, it is at least possible that one or more of the existing plaintiffs may be able to make an as-applied challenge. The briefing in this case casts the constitutional injury as occurring when a woman who is pregnant and incapacitated is, despite her express wishes to the contrary, denied the right to forego further medical treatment. As the Court pointed out during oral argument, the constitutional injury could, alternatively, be described as occurring at the moment the state limits a woman's right to prospectively dictate the healthcare she receives in the event she becomes incapacitated. Under this view a woman who has executed a healthcare directive which the state has indicated it will not permit to be enforced, suffers an immediate constitutional injury which can be redressed in an as-applied challenge to the statute. The Court does not offer any opinion

as to whether such a view will prevail, but it would appear to be an approach worthy of consideration – given the important constitutional rights at play here.

## ORDER

**IT IS ORDERED:**

1. Defendants' Motion to Dismiss (Dkt. 17) is **GRANTED**,[7] with leave to amend. If no amended complaint is filed within 30 days, the case will be closed.

DATED: March 28, 2019

B. Lynn Winmill
U.S. District Court Judge

---

[7] Plaintiffs' Amended Complaint contains allegations that certain components of Idaho's bureaucracy have acted *ultra vires* in their interpretation of the Pregnancy Exclusion. Dkt. 16 at ¶¶ 27-30. Plaintiffs' causes of action, despite containing incorporation by reference provisions, appear to focus solely on the facial validity of the Pregnancy Exclusion as codified. *Id.* at ¶¶ 32-41. The Court's decision, in accordance with the Parties' briefing, focuses solely on the facial challenge, and does not evaluate Plaintiffs' potential *ultra vires* claim. Plaintiffs are free to pursue this claim in an amended complaint.