Richard C. Boardman, Bar No. 2922
RBoardman@perkinscoie.com
PERKINS COIE LLP
1111 West Jefferson Street, Suite 500
Boise, ID  83702-5391
Telephone:  208.343.3434
Facsimile:  208.343.3232

Kevin Díaz, admitted *Pro Hac Vice*
kdiaz@compassionandchoices.org
COMPASSION & CHOICES
101 SW Madison Street, Unit 8009
Portland, OR 97207
Telephone: 503.943.6532

Kim Clark, admitted Pro Hac Vice
kclark@legalvoice.org
LEGAL VOICE
907 Pine Street, Suite 500
Seattle, WA  98101
Telephone: 206.682.9552

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANNA ALMERICO, CHELSEA GAONA-LINCOLN, MICAELA AKASHA DE LOYOLA-CARKIN, and HANNAH SHARP,<br><br>    *Plaintiffs,*<br><br> v.<br><br>LAWRENCE DENNEY, as Idaho Secretary of State in his official capacity, LAWRENCE WASDEN, as Idaho Attorney General in his official capacity, RUSSELL BARRON, as Director of the Idaho Department of Health and Welfare in his official capacity,<br><br>    *Defendants.* | Case No. 1:18-CV-00239-BLW<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION OF MEMORANDUM DECISION AND ORDER [DKT 33]** |

I.     **Introduction.**

The Memorandum Decision and Order constitutes clear error because it fails to subject the Pregnancy Exclusion to the same strict scrutiny analysis that the Court applied in *Salerno* – a standard that the Pregnancy Exclusion cannot satisfy under any circumstance. Under *United States v. Salerno*, a statute that burdens the fundamental right to liberty must satisfy strict scrutiny. *U.S. v. Salerno,* 481 U.S. 739, 745 (1987). If it does not, it is fatally flawed and there is *"no set of circumstances"* in which it could be applied in a manner that is constitutional. *Id.* (emphasis added).  This is not just Plaintiffs' opinion. The Ninth Circuit interprets *Salerno* the same way.  *Lopez-Valenzuela v. Arpaio*, 770 F. 3d 772, 777 (9th Cir. 2014) (citing *Salerno*, 481 U.S. at 748-51, for the proposition that a statute that burdens the fundamental right to liberty must be "carefully limited" to serve a "compelling governmental interest").

Defendants do not dispute that the right to direct one's medical treatment is fundamental. Nor do they dispute that often the only meaningful way to exercise this right is to do so prospectively. That is why the State of Idaho passed the Idaho Medical Consent and Natural Death Act.  Instead, Defendants assert that there is nothing to prevent the state from depriving all pregnant people of this fundamental right and conditioning the rights of all women upon their not becoming pregnant, so long as it could justify restricting the liberty of one individual in a single hypothetical case.  Dkt. 38 at 2-3. According to Defendants, such a sweeping restriction need not be supported by a compelling government interest so long as the state could have a compelling interest in a single case. *Id.* Nor must the restriction be narrowly tailored to address only those circumstances in which the state does have a compelling interest.  *Id.* at 2-4.  Neither *United States v. Salerno*, nor any other case supports this backwards logic.

Under *Salerno*, for a restriction on the fundamental right to direct one's medical treatment to be valid, the restriction would have to be narrowly tailored to apply only in those circumstances in which the state could assert a compelling interest. *Id.* at 748-51. Further, the restriction would have to include procedural protections to ensure that even in those narrow circumstances, the state would honor the health care directive of every individual unless and until it could demonstrate a sufficiently compelling interest to override that directive. *Id.* The Pregnancy Exclusion does the opposite. Instead of placing the onus upon the state to justify depriving people of their right to medical decision-making in each case *before* invalidating any part of a person's health care directive, the Pregnancy Exclusion establishes, as the default, that the health care directives of *all* people who are or could become pregnant are unenforceable

To suggest, as Defendants do, that pregnant women can always assert their rights once they become incapacitated is as pernicious as it is nonsensical. Once someone is incapacitated, the window for making one's own medical decisions is closed. The harm has long since taken place. All persons, pregnant or not, are entitled to due process *before* the state can deprive them of their fundamental right to liberty. The Pregnancy Exclusion turns this age-old principle on its head.  Thus, there is *no set of circumstances* in which the Exclusions would be constitutional.

There is likewise no set of circumstances in which the Pregnancy Exclusion could be applied in a manner that comports with the Equal Protection Clause. There is no rational basis, let alone a compelling reason to limit the enforceability of the health care directives of people who can become pregnant in service of potential life, while honoring without question the health care directives of others whose bodies may sustain the lives of third parties who are actually alive. Underlying the Pregnancy Exclusion are offensive stereotypes that deeply demean women – nothing more. As such, the Pregnancy Exclusion also discriminates based on gender.  For this

myriad of reasons, there is no set of circumstances in which the Pregnancy Exclusion could be applied in a manner that is constitutional, and it was clear error to conclude otherwise.

### II. It Was Clear Error Not To Subject The Pregnancy Exclusion To The Same Strict Scrutiny Analysis That The Court Applied In *Salerno*.

As Plaintiffs have argued throughout these proceedings, the holding of *Salerno* is clear: a blanket restriction on the fundamental right to liberty must be supported by a compelling government interest; it must be narrowly tailored to address that interest; and it must guarantee procedural due process on a case-by-case basis. Otherwise, it is unconstitutional in all circumstances. *Salerno*, 481 U.S. at 748-51.

Contrary to Defendant's Response, this is precisely how the Ninth Circuit interprets *Salerno*. *Arpaio*, 770 F. 3d 772.[1] *Lopez-Valenzuela v. Arpaio* concerned a facial challenge alleging that legislation enacted pursuant to Proposition 100, a measure to amend the state constitution to preclude bail for certain offenses if the person charged was in the United States illegally, violated plaintiff's fundamental right to liberty. The Ninth Circuit struck down the law because it did not satisfy strict scrutiny, as required by *Salerno*, observing:

> the Court [in *Salerno*] concluded that the Bail Reform Act satisfied heightened scrutiny because it . . . served a 'compelling' . . . governmental interest 'in preventing crime by arrestees'. . . [The Act]: (1) 'narrowly focuse[d] on a *particularly acute problem* in which the Government interests are overwhelming' . . . (2) 'operate[d] only on individuals who have been arrested for a specific category of extremely serious offenses' — individuals that '*Congress specifically found*' were 'far more likely to be responsible for dangerous acts in the community after arrest' . . . and (3) afforded arrestees '*a full-blown adversary hearing*' at which the government was required to 'convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person.'

---

[1] *See also Buffin v. City & Cty. of S.F.*, No. 15-cv-04959-YGR, 2018 U.S. Dist. LEXIS 6853, *14-15 (N.D. Cal. 2018) (concluding, based on *Salerno* and *Arpaio*, that strict scrutiny applied to plaintiffs' claims that the county system of pretrial bail violated their fundamental right to liberty).

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION OF MEMORANDUM DECISION AND ORDER [DKT 33] - 4
144424186.2

*Id.*, 770 F.3d at 779-780 (emphasis added) (quoting *Salerno*, 481 U.S. 739) (internal citations omitted). Thus, the court concluded, the laws at issue would satisfy substantive due process only if "*'narrowly tailored to serve a compelling state interest.'*" *Id.* at 781(emphasis added) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993) (citing *Salerno*, 481 U.S. at 746). Because the Proposition 100 laws did not meet this exacting standard, the court concluded that "the *entire statute* fails [under] *Salerno*] . . . and would thus be invalid *in all of its applications*." *Id.* at 789 (second emphasis added) (citing other sources).

Indeed, the court was explicit that the legislation was invalid "in all of its applications" even though there might be cases in which the state could justify detaining a person without bail. As the court explained, "[e]ven persons who could be detained [if properly afforded due process] could successfully challenge the Proposition 100 laws . . ." *Id.* (citing other sources). The Pregnancy Exclusion does not afford due process to some plaintiffs but not others. It does not afford due process at all. Thus, "facial invalidation is appropriate," as "any [person who is pregnant] raising the same challenge[s] [that plaintiffs' raise] would also win." *Id.* quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 376 (2010) (Roberts, C.J., concurring).

Defendants cite *Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004) and *S.D. Myers, Inc. v. City & Cty. of S.F.*, 253 F.3d 461 (9th Cir. 2001) for the proposition that the Court need not apply strict scrutiny. Those cases are inapposite, however, as the claims to which the *Salerno* standard applied did not assert violations of a fundamental right. *Tucson Woman's Clinic*, 379 F.3d 531 (applying the *Salerno* "no set of circumstances" standard to a claim that a regulation requiring a physician with admitting privileges be present anytime abortions were being performed constituted an unconstitutional delegation of authority to private hospital boards – not that it violated a fundamental right); and *S.D. Myers, Inc.*, 253 F.3d at 472 (applying the

*Salerno* standard to a claim that a San Francisco ordinance was "facially invalid under principles of due process" – not because it violated a fundamental right – but because it exerted extraterritorial control over plaintiff's lawful business practices).

*Salerno* is clear, as is the law in the Ninth Circuit. A blanket restriction on the right to liberty that does not itself satisfy strict scrutiny is invalid in all circumstances. *Salerno*, 481 U.S. at 747-51; *Arpaio*, 770 F.3d at 782-89. As set forth in Plaintiffs' Complaint, and as they have argued at every stage of these proceedings, the Pregnancy Exclusion satisfies none of the requirements of strict scrutiny. Unlike the Bail Reform Act, which was supported by Congressional findings based on extensive research about the risk of danger to the community posed by a certain narrow class of arrestees (those charged with offenses generally associated with organized crime), Defendants have offered no compelling reason to deny all pregnant people their fundamental right to medical decision-making.[2] Even if the Pregnancy Exclusion was supported by a compelling state interest, it is not narrowly tailored. It is not tailored at all.[3] Finally, in stark contrast to the robust protections in the Bail Reform Act to ensure that no individual suffered any loss of liberty without an individualized weighing of the interests of the state versus the interests of that individual, the Pregnancy Exclusion deprives all pregnant women of their fundamental right to medical decision-making with no process at all.

Defendants suggest in a footnote that Plaintiffs cannot assert a claim based on the denial of procedural due process because they do not allege that "any hospital employs deficient

---

[2] Indeed, it is hard to imagine how there could be any such justification as Defendants concede that it would be the rare circumstance in which this would even occur. Dkt. 27 at 3-4.
[3] Again, it is hard to imagine how a blanket restriction like the Pregnancy Exclusion could ever satisfy this requirement given the admonition by the court in *In re A.C.* that while the court could "not quite foreclose the possibility that a conflicting state interest may be so compelling that the patient's wishes must yield . . . such cases [would] be extremely rare and truly exceptional." *In re A.C.*, 573 A.2d 1235, 1252 (D.C. 1990).

procedures . . . ".  This argument misses the point entirely. By the time someone is incapacitated, the harm is already done. The window for exercising his or her right to medical decision-making has closed. The process that hospitals employ as a last resort when a person does not have an health care directive, known as "substituted judgment," is no substitute for the right to make one's own decisions, nor does "substituted judgment" afford the due process that the Fourteenth Amendment requires.[4]  That is precisely why invaliding a health care directive is equal to depriving a person of the right to medical decision making and must be actionable at the moment the health care directive is executed.  It is also the reason why Idaho passed the Idaho Medical Consent and Natural Death Act – to ensure that the right to medical decision-making is meaningful, at least for those Idahoans who can become pregnant.[5]  By refusing to recognize their health care directives, the Pregnancy Exclusion effectively deprives all pregnant people of their right to medical decision-making – a harm that is immediate and not hypothetical – with no due process.[6] Thus, under *Salerno,* there is no set of circumstances in which the Pregnancy

---

[4] The circumstances under which the process of substituted judgment takes place – under significant time constraints, with less than reliable evidence, and without most of the benefits of a full-blown adversarial hearing -- render it wholly inadequate to ensure due process.  In the words of the court in *In re A.C*: "[a]ny intrusion implicating such basic values ought not be lightly undertaken when the mother . . . is in no position to prepare meaningfully for trial. . . . 'The procedural shortcomings rampant in these cases are not mere technical deficiencies. They undermine the authority of the decisions themselves, posing serious questions as to whether judges can . . . realistically frame principled and useful legal responses to the dilemmas with which they are being confronted . . . Courts dealing with other . . . medical decision-making conflicts have insisted both upon much more rigorous procedural standards and . . . significantly more information.'" *Id.*, 573 A.2d at 1248 (quoting Gallagher, *Prenatal Invasions and Interventions: What's Wrong with Fetal Rights*, 10 Harv. Women's L.J. 9, 49 (1987)).

[5] There is nothing in the Idaho Medical Consent and Natural Death Act or anywhere else to inform medical providers that they should afford any process at all.  Even if the state restructured the statute so as to afford due process *before* declaring any person's health care directive invalid, the critical questions are not "whether a woman is pregnant, whether she is incapacitated, [and] what procedures are medically necessary and appropriate." The critical questions are: (1) what the pregnant person would have wanted; and (2) whether the interest of the state in her specific case is sufficiently compelling to override her right to make that decision for herself.  *Id.* at 1247.

[6] As Plaintiffs' counsel noted during oral argument, there appear to be no reported cases in the Ninth Circuit that specifically address whether the refusal to recognize a health care directive is

Exclusion could be applied constitutionally.  Defendants confused interpretation of the law represents a radical departure from well-settled principles of due process for which there is no authority. Adopting this logic, especially on a Motion to Dismiss, was clear error.

### III. It Was Clear Error To Dismiss Plaintiffs' Equal Protection Claims.

#### a. There is no constitutional basis to invalidate the health care directives of pregnant people, but not others whose bodies could sustain another's life.

It was clear error to dismiss Plaintiffs' Equal Protection claims without any analysis.  The arguments Defendants raise in support of this decision are unavailing.  As Plaintiffs have explained throughout this litigation, there is no rational basis, let alone a compelling one for Idaho to constrain the rights of people with the capacity for pregnancy, but not the rights of others whose bodies could sustain the life of another living person.[7] A person whose kidney or marrow or blood could save their living child or other relative is not forced to prospectively and irretrievably forego their statutory and constitutional rights. The law does not permit the state to violate the bodily integrity of one group of people but not another without a compelling basis for making that distinction. *See Skinner v. Okla.*, 316 U.S. 535 (1942).  *Dandridge v. Williams*, 397

---

itself a violation of a fundamental right.  Other lower courts have held, however, that state policies that refuse to honor health care directives violate the fundamental right to liberty, and those affected need not wait until they are sick to challenge those policies.  *Stockwell v. State*, 54 Kan. App. 2d 325, 328-329 (Kan. Ct. App. 2017) (holding that a state hospital policy that largely invalidated the "Do Not Resuscitate" requests of individuals who were involuntarily confined violated the plaintiff's fundamental right to refuse unwanted medical treatment, notwithstanding that the plaintiff was not yet sick or seeking to enforce his DNR).  *See also, Self v. Milyard*, No. 11-cv-00813-RBJ-CBS, 2012 U.S. Dist. LEXIS 129263, *23 (observing that "it is constitutionally mandatory that a prison have in place a reasonable and effective method of assuring that an inmate's DNR directive will be honored. . . .") In any event, Defendants have not disputed that the refusal to recognize a health care directive is tantamount to a denial of the fundamental right to medical decision-making, or that Plaintiffs have standing right now to assert their claims.

[7] To be clear, Plaintiffs have never argued that Idaho has drawn a distinction between pregnant women and other people "with a connection to the fetus." *See* Dkt. 38 at 7.

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION OF MEMORANDUM DECISION AND ORDER [DKT 33] - 8
144424186.2

U.S. 471, 486-87 (1970) does not undermine the core principle in *Skinner*. Critically, *Dandridge* did not involve a statute that burdened a fundamental right, so the state did not have to establish a compelling justification for the distinction it drew.

Moreover, just one year after the Supreme Court decided *Dandridge*, it also held that, while the Equal Protection Clause does not wholly deny to states the power to distinguish between classes of persons it "[D]oes, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria *wholly unrelated to the objective of that statute*." *Reed v. Reed*, 404 U.S. 71, 75-76 (1971) (striking down an Idaho law that preferred "males over females" in appointing administrators of an intestate's estate as unconstitutional sex discrimination) (emphasis added). Thus, even classifications that do not implicate a fundamental right or a suspect class – must "rest upon some ground of difference *having a fair and substantial relation to the object of the legislation*, so that all persons similarly circumstanced shall be treated alike." *Id.* (emphasis added) *(citing Royster Guano Co*. v. *Virginia*, 253 U.S. 412, 415 (1920)).

Further, the Pregnancy Exclusion was not enacted as an end unto itself, to "attack" a "social problem" of pregnant women foregoing medical interventions that might benefit their fetuses. It is part of a law whose object is to "recognize the right of a competent person to have his or her wishes for medical treatment and for the withdrawal of artificial life-sustaining procedures carried out even though that person is no longer able to communicate with the health care provider" and "to establish an effective means for such communication." I.C. § 39-4509(2), (3). Rather than having "a fair and substantial relation to the object of the legislation," the Pregnancy Exclusion undermines this purpose. The Equal Protection Clause does not give states *carte blanche* to experiment on its residents in service of hypothetical problems. *See, e.g., U.S.*

*Dep't of Agric. v. Moreno*, 413 U.S. 528, 538 (1973) (denying food stamps to households of unrelated people violated the Equal Protection Clause as it was "wholly irrational" and undermined the purpose of the program by excluding the people most in need); *Romer v. Evans*, 517 U.S. 620 (1996) (law that repealed and prohibited new laws that protected LGTBQ Coloradans from discrimination was irrational because it was specious and based on animus).

> **b. Restricting the enforceability of the health care directives of all who are or can become pregnant is unconstitutional, gender-based discrimination.**

When a state imposes a restriction that is based on gender, the state's burden is heightened. *Sessions v. Morales-Santana*, 198 L. Ed. 2d 150 (2017) (holding immigration preference for children of "unwed mothers" unconstitutional). As the Court held in *Morales-Santana*, "[s]uccessful defense of legislation that differentiates on the basis of gender . . . requires 'an exceedingly persuasive justification.' *Id.* at 163 (c*iting U.S. v. Virginia*, 518 U.S. 515, 531 (1996); *Kirchberg v. Feenstra*, 450 U.S. 455, 461 (1981)).

The Pregnancy Exclusion ensures that all women's health care directives – tools to ensure their constitutional rights to bodily autonomy and medical privacy and to communicate deeply personal decisions about life and death – are immediately contingent, rather than fully respected in the eyes of the law. It does so in the name of fetal protection, a purpose that the Supreme Court has rejected as a proper basis for gender-based discrimination. *Auto. Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 206, 211 (1991) (employer's policy excluding all fertile women from jobs that exposed them to lead was sex discrimination under Title VII of the Civil Rights Act). The true analog to the Pregnancy Exclusion law is not the *Pemberton* scenario that Defendants propose, which involved the rights of a single individual. *See Pemberton v. Tallahassee Mem. Reg. Med. Ctr.,* 66 F. Supp.2d 1247 (N.D. Fla. 1999). The true analog would be a state law requiring all pregnant women to submit to cesarean surgery, or a law prohibiting

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION OF
MEMORANDUM DECISION AND ORDER [DKT 33] - 10
144424186.2

all women of reproductive age from working in certain jobs that exposed them to teratogenic chemicals. That these laws would be unconstitutional *in all circumstances* is obvious.[8]

Conditioning the validity of women's health care directives on their not becoming pregnant while unquestionably honoring men's health care directives, is a vestige of offensive stereotypes that deeply demean women. For over fifty years, courts have unequivocally rejected those stereotypes as a basis for restricting women's rights. *Morales-Santana,* 198 L. Ed. 2d at 162-163 (detailing the history of Equal Protection decisions addressing "an era when the Nation's lawbooks were rife with overbroad generalizations about the way men and women are.")[9]

Having summarily concluded that there is some set of circumstances in which the Pregnancy Exclusion could be applied constitutionally, the Court effectively held that the Pregnancy Exclusion comports with Equal Protection. To reach this conclusion without any analysis on a Motion to Dismiss constitutes clear error. For the foregoing reasons, Plaintiffs' respectfully request that this Court reconsider and reverse its Memorandum Decision and Order.

---

[8] It is the conflation of the Pregnancy Exclusion with abortion that clouds what should otherwise be clear here. Of course, even under abortion jurisprudence the Pregnancy Exclusion would be unconstitutional. Indeed, a blanket ban on post-viability abortions, just because *some* post-viability abortions could be prohibited, is unconstitutional. *Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 846 (1992) (the state may restrict abortions after viability, "if the law contains exceptions for pregnancies which endanger the woman's life or health.").

[9] *See also Stanton v. Stanton*, 421 U.S. 7, 14-15 (1975) ("[n]o longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas"); *Casey*, 505 U.S. at 897 ("[o]nly one generation has passed since this Court observed that 'woman is still regarded as the center of home and family life,' with attendant 'special responsibilities' that precluded full and independent legal status under the Constitution. . . [t]hese views, of course, are no longer consistent with our understanding of the family, the individual, or the Constitution") (internal citations omitted).

DATED: May 16, 2019.

**PERKINS COIE LLP**

By: ___/s/ Richard C. Boardman___
    Richard C. Boardman
    RBoardman@perkinscoie.com
    1111 West Jefferson Street, Suite 500
    Boise, ID  83702-5391
    Telephone:  208.343.3434

**COMPASSION AND CHOICES**

By: ___/s/ Kevin Diaz___
    Kevin Díaz, admitted *Pro Hac Vice*
    kdiaz@compassionandchoies.org
    4224 NE Halsey St., Suite 335
    Portland, OR 97213
    Telephone: 503.943.6532

**LEGAL VOICE**

By: ___/s/ Kim Clark___
    Kim Clark, admitted *Pro Hac Vice*
    kclark@legalvoice.org
    907 Pine Street, Suite 500
    Seattle, WA  98101
    Telephone: 206.682.9552

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 16, 2019, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

W. Scott Zanzig
Civil Litigation Division
Office of the Attorney General
scott.zanzig@ag.idaho.gov

        ___/s/ Richard C. Boardman___
        Richard C. Boardman